IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 24, 2006 Session

## WILLIAM RHEA JACKSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-D-2190      Steve Dozier, Judge**

---

**No. M2005-00528-CCA-R3-PC - Filed March 9, 2006**

---

A Davidson County jury convicted the Petitioner, William Rhea Jackson, of robbery, rape, aggravated burglary, attempted rape, aggravated kidnapping, and misdemeanor theft. This Court affirmed the convictions on direct appeal, and the Tennessee Supreme Court denied review. The Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. The Petitioner appeals, contending that his trial counsel rendered ineffective assistance of counsel. After thoroughly reviewing the record and the applicable law, we conclude that there exists no reversible error. Accordingly, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Charles E. Walker, Nashville, Tennessee, for the Appellant, William Rhea Jackson.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Amy H. Eisenbeck, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Facts on Direct Appeal**

As set forth in our Court's opinion on direct appeal, the proof at the Petitioner's trial established the following facts:

The victim in this case, a widow in her early eighties, testified that on the morning of September 9, 2000, she heard a knock at her door. She lived in a house by herself on South Eleventh Street in Nashville. When she opened the door, a black

male covered her face with something and asked where her money was. The man took her by the arm and pushed her down on her bed. He covered her head with a pillow and again asked where her money was.

As the victim lay on her bed, the man rummaged through her house. After about thirty minutes, she testified, the man returned to her bedroom, pulled up her gown, got on top of her, and inserted his finger into her rectum. He then got up, again asked about her money, and left the room.

The man returned some time later, still asking about the victim's money. He got on top of her again and took four rings off of her fingers and a necklace off of her neck. He then put his penis in the victim's face, demanding that she "suck it." The victim refused, and her attacker twice repeated his demand, but the victim did not comply. The victim testified that the man then grabbed a pillowcase, put it over her head, and tied her hands behind her back. He got on top of her again, rubbed his penis on her body, and again inserted his finger into her rectum. He then got up and left the room.

The victim heard her attacker still in the house. Again, he returned to the bedroom, and again he demanded to know where the victim's money was. He then tied the victim's feet together and asked her if she was going to have company. When she replied, "yes," he then asked, "when?" The victim told the man, "now," and he finally left the house. The victim testified that the entire episode lasted approximately two hours.

When the victim realized that her attacker had left, she removed the pillowcase from her head and managed to get across the street to a neighbor. The neighbor untied the victim's hands, and she returned to her house, discovering that her car was gone. She called the police.

The victim testified that, in addition to her car and jewelry, she was missing her VCR, three pocketbooks, and a large sport bag. The victim testified that she had heard the man rummaging through her house, opening drawers, and pulling the top off of a large popcorn tin in her bedroom. She explained that this tin had been given to her, probably at Christmastime in 1999. Officer Charles Anglin subsequently recovered a latent thumbprint from the popcorn can, using the brush and powder technique. Loreta Marsh, a fingerprint examiner with the Metro Police Department, testified that this latent print matched the Petitioner's left thumbprint. Julie Hooper, Ms. Marsh's supervisor, also examined the latent print and verified that it matched the Petitioner's. A latent print was also obtained from the victim's car after it was discovered abandoned in another county. This print did not match the Petitioner and was never identified.

After the fingerprint match was obtained, Detective Julie Lawson prepared a photographic line-up of six black men, including a photograph of the Petitioner. She showed this line-up to the victim at the victim's home. Det. Lawson testified that, upon viewing the six photographs, the victim said that she could "narrow it down to one of [photographs one, three and six]," stating, "one of those is him." The victim was unable to further identify her attacker; however, photograph number one in the line-up was of the Petitioner. When asked to look at the Petitioner at trial, the victim stated that, to her knowledge, she had never seen him.

After the Petitioner was taken into custody on September 14, 2000, on unrelated charges, Det. Lawson and Detective Keith Sutherland met with the Petitioner for the purpose of interviewing him about the attack on the victim. Det. Lawson testified at trial that while she was reading the Petitioner his Miranda rights, the Petitioner interrupted her by saying that he wanted to know what the allegations were. Det. Lawson testified that she told the Petitioner she would tell him what the allegations were but that she had to finish with his rights, first. She continued reading from the rights waiver form, took some personal information from the Petitioner, and then explained the basic facts of the attack. She asked the Petitioner to sign the rights waiver. Det. Lawson explained that the Petitioner refused to sign the waiver and kept asking what people were saying about him. Det. Lawson again read the Petitioner his rights. He told her that he would talk with her if she didn't tape-record the conversation. Det. Lawson agreed and then told the Petitioner about the evidence the police had collected at that point, including the victim's report and the matching fingerprint. According to Det. Lawson, the Petitioner responded by stating, "I've fucked up. I've messed my life up." The Petitioner made no further statements concerning the case.

When he was taken into custody, the Petitioner had a pawn ticket in his pocket. Further police investigation revealed that a pawn ticket to William R. Jackson had been issued by Household Pawn Number One in Nashville on the afternoon of September 9, 2000. This pawn ticket indicated that a necklace and three rings had been pawned. Raymond Houser testified that he was the pawn-shop employee who had accepted the pawn and issued the ticket. Mr. Houser explained that, in order to issue a ticket, he had to see a Tennessee identification card containing a photograph of the customer. The identification card presented to him in this instance contained the same information found on the identification card which the Petitioner was carrying when he was arrested, and this information was reflected on the pawn ticket.

Mr. Houser explained that he verified the identification of the person presenting the card by comparing the photograph to the person. The police were able to recover two of the rings from the pawnshop, and Mr. Houser confirmed that these two rings were the ones taken from the man who identified himself as William Rhea

Jackson. The victim and her daughter both identified these rings at trial as belonging to the victim.

Dennis Gordon testified on behalf of the Petitioner. Mr. Gordon testified that he had known the Petitioner for a "long time." He and the Petitioner frequently spent time together in the area of South Eleventh Street. Nearby was a Family Dollar store. Mr. Gordon explained that his girlfriend worked in the Family Dollar store and that he was in the store with the Petitioner on several occasions.

Natika Spann, Mr. Gordon's girlfriend, testified that she worked in the Family Dollar store. She explained that the store carried Christmas popcorn tins like the one in the victim's bedroom from which the Petitioner's fingerprint had been recovered. She also testified that she had never seen the Petitioner in the store.

Sharon Jackson, the Petitioner's sister, testified that her brother had lived in the South Eleventh Street neighborhood prior to his arrest. She explained that the Family Dollar store was just a few blocks from his apartment. She further testified that she had been in the Family Dollar with the Petitioner at Christmastime in 1999.

The victim was called by the State in rebuttal, and testified that she cleaned the popcorn tin every time she dusted.

State v. William Rhea Jackson, No. M2002-00762-CCA-R3-CD, 2003 WL 1563663, at *1-3 (Tenn. Crim. App., at Nashville, Mar. 27, 2003), *perm. app. denied* (Tenn. Aug. 25, 2003). In that opinion on direct appeal, this Court affirmed the Petitioner's convictions and sentence.

### B. Post Conviction Facts

The Petitioner timely filed a petition for post-conviction relief, and the post-conviction court appointed an attorney to represent the Petitioner. At an evidentiary hearing on the petition for post-conviction relief, the following evidence was presented: The parties stipulated that the hospital records from Baptist Hospital and General Hospital did not show that the victim was a patient at either facility. Robert David Baker ("Counsel") testified that he was appointed to represent the Petitioner at trial in a criminal case. When questioned about a motion to suppress the statements that the Petitioner made to Detective Lawson, Counsel testified that he moved to suppress the Petitioner's statements, and, in this motion, he argued that the Petitioner had refused to sign the waiver and that the State could not demonstrate a knowing, intelligent waiver of the Petitioner's Miranda rights. He explained that, despite this motion, the trial court allowed the jury to hear about the Petitioner's statements.

When questioned about a fingerprint that was found in the victim's car, Counsel testified that he did not recall discussing this fingerprint with Detective Lawson prior to trial. He explained that the Public Defender's Office retained an expert to examine fingerprint matches that had already been

made, but he did not think that the Public Defender's Office has any capability to conduct its own fingerprint matches. He described how the fingerprint expert retained by the Public Defender's Office said that this fingerprint was an identifiable print, but "they couldn't match it to anyone, so, it was unknown." Counsel further explained that the fingerprint expert retained by the Public Defender's Office would not have the capability of doing an Automated Fingerprint Identification Systems check to determine if "there was anyone out there that matched this particular print." Counsel testified that the fingerprint expert was retained to consult about a fingerprint that the State found on a popcorn can which allegedly matched the Petitioner's fingerprint. Counsel did not recall the Petitioner disagreeing with this particular course of conduct.

Counsel did not recall having any problems communicating with the Petitioner and thought that he got along well with the Petitioner. He explained that the Petitioner requested that Counsel pursue the defense that the Petitioner was not the individual who committed the crimes against the victim, and Counsel pursued that defense.

Counsel thought that he requested jury instructions for lesser-included offenses but was unsure. He said that the Court of Criminal Appeals, after a conducting a plain error analysis, reversed one of the Petitioner's convictions due to the trial court's failure to instruct the jury on a lesser-included offense that Counsel did not request. He further agreed that theft is a lesser-included offense of aggravated burglary.

Counsel did not recall having any records about a rape kit or similar tests that were performed on the victim. He did not believe that the victim ever received any such tests. After reading a transcript of the trial proceedings, Counsel explained that Detective Lawson testified that the victim was not given a rape kit or other testing because the crime involved digital penetration, and DNA evidence is difficult to retrieve from the victims of such crimes. He further testified that Detective Lawson said that the hospital where the victim was taken did not have the equipment necessary to look for signs of tears or abrasions. Counsel testified that, based on Detective Lawson's statement, "depending on how you look at [the trial transcript]," a jury could have been left with the impression that a test was performed on the victim.

Under direct examination from the State, Counsel testified that he met with the Petitioner on numerous occasions. He explained that Marvin Powell, who worked as the Chief Investigator for the Public Defender's Office, assisted him with the case. He testified that he looked for "Billy," an individual who allegedly untied the victim, but was unable to find or speak with "Billy" even though Powell assisted him with the investigation.

On cross-examination, upon request by the State, Counsel read the following lines from the trial transcript:

"Question: Okay. Did [the victim] go to the doctor?"
"Answer: No, not - - "
"Question: She had some chest - - "

"Answer: She had some bruising around her ribs."
"Question: But she didn't go to the doctor?"
"Answer: No, sir."

Counsel further testified that, on the day of the trial, he filed a motion in limine to keep the jury from hearing the statements that the Petitioner gave to Detective Lawson.

On redirect examination, Counsel explained that he spent a considerable amount of effort to locate "Billy."

Detective Keith Sutherland testified that he assisted Detective Lawson in an investigation concerning the Petitioner. He recalled that the Petitioner told the detectives that the Petitioner had made a mistake but that the Petitioner did not sign a rights waiver form. He testified that he did not interview any witnesses concerning this case.

The Petitioner's sister testified that, when her brother got arrested, she went downtown and spoke with Detective Lawson who told her that investigators had found a vehicle with two fingerprints in the car, and one thumb print came from someone with a big hand. She further testified that Detective Lawson said that "she should know who the other person was" after test results came back from the lab. The Petitioner's sister explained that, due to this conversation with Detective Lawson, Counsel wanted her to testify at trial. She said that, at trial, a District Attorney approached her and asked what she planned to say, and she replied that the District Attorney would learn what she planned to say after she testified. The Petitioner's sister further testified that Counsel later approached her and asked her not to testify about the conversation that she had with Detective Lawson.

The Petitioner testified that he asked Counsel questions about a popcorn can that was missing from the police property room, and Counsel never answered those questions. He testified that Counsel should have objected when this popcorn can was introduced into evidence. The Petitioner testified that Counsel never discussed lesser-included offenses with him, and he was unaware that he was entitled to have certain instructions about lesser-included offenses given to the jury. He said that Counsel never responded after he asked Counsel to go to the hospital where the victim was treated and to interview the individuals at the hospital that spoke with Detective Lawson. The Petitioner also said that Counsel never responded after he asked him to interview "Billy." The Petitioner further testified that he should have had a fingerprint expert witness at his trial. He could not recall how many times Counsel met with him.

Based of the foregoing evidence, the post-conviction court determined that Counsel rendered effective representation to the Petitioner and dismissed the petition for post conviction relief.

## II. Analysis

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or

sentence is void or voidable because of the abridgment of a constitutional right.  Tenn. Code Ann. § 40-30-103 (2003).  The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence.  Tenn. Code Ann. § 40-30-110(f) (2003). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997).  A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001).  A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness.  Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review.  State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); Burns, 6 S.W.3d at 461; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  This right to representation includes the right to "reasonably effective" assistance.  Burns, 6 S.W.3d at 461. The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the Petitioner must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the Petitioner by the Sixth Amendment. Second, the Petitioner must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the Petitioner of a fair trial, a trial whose result is reliable. Unless a petitioner makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

State v. Melson, 772 S.W.2d 417, 419 (Tenn. 1989).  In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases.  Baxter, 523 S.W.2d at 936.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Strickland v. Washington, 466 U.S. 688 (1984)).  When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).

The reviewing court must evaluate the questionable conduct from the attorney's perspective

at the time. Strickland, 466 U.S. at 690; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665, n.38 (1984)).

Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House, 44 S.W.3d at 515 (citation omitted); Thomas Brandon Booker v. State, No. W2003- 00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *perm. app. denied* (Tenn. 2004). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

On appeal, the Petitioner contends that the post conviction-court erred when it dismissed his petition because Counsel was ineffective. Specifically, he asserts that Counsel failed to raise all available defenses, failed to interview and locate "Billy," and failed to subpoena the records from or the records custodian of Baptist Hospital and General Hospital. The State counters that Counsel's representation was well within the range of competence required of attorneys in criminal cases.

### A. Failure to Raise All Available Defenses

The Petitioner claims that Counsel was ineffective by failing to raise all possible defenses. The State argues that the Petitioner's claim is without merit and his appeal for relief should be denied. The post conviction court found that Counsel fully explored all of the Petitioner's potentially meritorious defenses.

Counsel has the duty to make reasonable investigations into the case and to raise all available

defenses in a timely manner. Burns, 6 S.W.3d at 462, (quoting Strickland, 466 U.S. at 691; Baxter, 523 S.W.2d at 932-33). Although counsel's decisions are entitled to a heavy measure of deference, uninformed choices based on inadequate preparation may constitute ineffective assistance. Hellard, 629 S.W.2d 4, 9 (Tenn.1982) (quoting United States v. DeCoster, 487 F.2d 1197, 1201(D.C. Cir. 1973)). The advice given and the services rendered by an attorney in a criminal case must be "within the range of competence demanded of attorneys in criminal cases." Baxter, 523 S.W.2d at 930. Counsel should discuss fully potential strategies and tactical choices with his client. Hellard, 629 S.W.2d at 9. The fact that a particular strategy or tactic hurt the defense does not, alone, support a claim of ineffective assistance. Id. Deference is made for sound trial strategy if the choices are informed and based upon adequate preparation. Id.

We conclude that the evidence does not preponderate against the post-conviction court's findings that Counsel fully explored all of the Petitioner's potentially meritorious defenses. The Petitioner provided no evidence that Counsel displayed a lack of preparation for trial or inadequate knowledge of the law and the evidence in the Petitioner's case. Counsel used all of the information provided by the Petitioner in order to develop an effective trial strategy. He testified that the Petitioner told him to pursue the defense that the Petitioner did not commit the crime, and Counsel pursued this strategy in a highly proficient manner. Therefore, we conclude that Counsel's trial strategy "falls within the wide range of reasonable professional assistance," and that the Petitioner is not entitled to relief on this issue.

### B. Failure to Investigate Case

The Petitioner claims that Counsel was ineffective by failing to adequately investigate the case. Specifically, the Petitioner alleges that Counsel failed to find and interview "Billy." The State argues that Counsel conducted a reasonable investigation of the case as evidenced by Counsel's testimony that he made considerable efforts to locate "Billy" with the assistance of the Chief Investigator from the Public Defender's Office. The post-conviction court accredited Counsel's testimony and concluded that "counsel did make sufficient and prudent efforts to locate this 'Billy' in an attempt to provide a better defense for the [P]etitioner."

The Tennessee Supreme Court has held that Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate also requires adequate legal research. Burns, 6 S.W.3d at 462 (quoting United States v. DeCoster, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973)). Therefore, Counsel must make all reasonable investigations relevant to the case or must make a reasonable decision that renders particular investigations necessary. Id. However, "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. Failure to conduct a reasonable investigation constitutes deficient performance. Id.

In order for a petitioner to establish prejudice from his attorney's failure to locate a witness, the petitioner must have this witness testify at the post-conviction hearing. Roy L. Sherrod v. State, No. 02C01-9806-CR-00164, 1999 WL 450237, at 7 (Tenn. Crim. App., at Jackson, June 30, 1999), *no Tenn. R. App. P. 11 application filed*; see also Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a witness or what that witness' testimony might have been if introduced by defense counsel." Black, 794 S.W.2d at 757.

Based on our review of the record, we conclude that the Petitioner has not demonstrated that Counsel failed to conduct a reasonable investigation of the case. Counsel testified that he made considerable efforts to locate and speak with "Billy." He also explained that he utilized the assistance of the chief investigator from the Public Defender's Office when trying to locate "Billy." The post-conviction court accredited Counsel's testimony, and we will not question the credibility findings made by the post-conviction court. Although Petitioner alleges that "Billy's" testimony would have supported the defense theory that the Petitioner was not the perpetrator of the offense and that "Billy" was the actual perpetrator, the Petitioner has provided no evidence to support this speculation. At his post-conviction hearing, the Petitioner failed to produce the witness who he claims Counsel failed to investigate and interview. He did not present any testimony or affidavits from this witness. The Petitioner provided no evidence to describe the testimony that he expected to receive from the witness who he alleges Counsel failed to call. Therefore, as a matter of law, this Court cannot speculate or guess as to what this witness's testimony might have been. The Petitioner is not entitled to relief on this issue.

### C. Failure to Subpoena Hospital Records

The Petitioner asserts that Counsel was ineffective by failing to subpoena either the records or a records custodian from either Baptist Hospital or General Hospital to prove that the victim was never admitted or treated by the hospitals. The State counters that the Petitioner has failed to show how any alleged failure to subpoena a records custodian or the actual medical records was deficient conduct by Counsel or was prejudicial to his case. The trial court found that Counsel conducted an adequate preparation for trial, and Petitioner failed to meet his burden under Strickland.

In our view, the absence of evidence regarding whether or not the victim was a patient at either Baptist Hospital or General Hospital does not undermine our confidence in the outcome of the Petitioner's trial. This Court found on direct appeal that "[t]he only proof of sexual penetration in this case was the victim's testimony. There was no corroborative proof of any sort. The victim did not seek medical attention after the attack." 2003 WL 1563663, at *18. The introduction of any evidence from the records at Baptist Hospital or General Hospital would not necessarily have contradicted the victim's testimony. The Petitioner's defense at trial was that he was not the perpetrator of the crimes against the elderly victim. Counsel's actions regarding the medical records from Baptist Hospital and General Hospital was in no way deficient and any alleged failure to obtain such records did not affect the outcome of Petitioner's trial. Therefore, the Petitioner is not entitled to relief on this issue.

### III.  Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE